O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HOMELAND HOUSEWARES, LLC, a California LLC; NUTRIBULLET, LLC, a California LLC, <br><br> Plaintiffs, <br><br> v. <br><br> EURO-PRO OPERATING LLC, a Massachusetts LLC, <br><br> Defendant. | Case No. CV 14-03954 DDP (MANx) <br><br> **ORDER RE: PRELIMINARY INJUNCTION** <br><br> [Dkt. No. 13] |

Presently before the court is Plaintiffs Homeland Housewares, LLC and Nutribullet, LLC (collectively, "Homeland")'s Motion for Preliminary Injunction. (Dkt. No. 13.) The motion is fully briefed. Having considered the parties' submissions and heard oral argument, the court adopts the following order.

**I.   Background**

In the instant motion, Homeland seeks a preliminary injunction in relation to its claims against Defendant Euro-Pro Operating LLC ("Euro-Pro") for false advertising and trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

Homeland and Euro-Pro are competitors in the home blender market. Homeland sells three products under its "NUTRIBULLET" line: the NUTRIBULLET CLASSIC, the NUTRIBULLET SPORT[1], and the NUTRIBULLET PRO 900 SERIES ("NUTRIBULLET PRO"). (Motion at 2; Declaration of Colin Sapire in Support of Motion ¶¶ 3, 6). Euro-Pro sells a line of blenders under its "NINJA" line, including the NUTRI NINJA PRO. The NUTRI NINJA PRO is sold alongside or in close proximity to the NUTRIBULLET blenders on the shelves of such retailers as Target, Walmart, and Bed, Bath, and Beyond. (Sapire Decl. 8, 18 and Ex. 11.)

Homeland contends that Euro-Pro makes a number of false claims on the packaging of the NUTRI NINJA PRO. The packaging includes, *inter alia*, the following two elements.

First, the packaging includes a comparison chart, presented below, labeled "NUTRI NINJA vs. NUTRIBULLET," ("Comparison Chart" or "Chart"). The Chart includes three columns. (Id.) The first column lists various product features, including "Nutrient & Vitamin Extraction," "900 Watts," "21,000 RPMs," "Finer Consistency," "Ice Crushing," "Pulse Technology," "Sip & Seal Lids," and "Fits in Cupholders." The second and third columns, labeled, respectively, "NUTRI NINJA" and "NUTRIBULLET," indicate the presence or absence of the listed features with either a check mark ("✓") or an X ("✗"). (Id.) As relevant for this motion, the Chart indicates that the NUTRI NINJA PRO operates at 900 Watts, produces 21,000 RPMs, has ice crushing capability, has pulse

---

[1] The NUTRIBULLET SPORT is apparently at an early stage in its introduction to the market. (See Declaration of Carrie P. Price in Support of Opposition ¶ 11.)

2

technology, has sip & seal lids, and fits in cupholders, but that the "NUTRIBULLET" has none of these features.



(Sapire Decl. Ex. 5.) Homeland contends that each of these factual assertions are false as to each product in its NUTRIBULLET line of blenders.

Second, the NUTRI NINJA PRO packaging contains the text "#1 MOST POWERFUL*," which Homeland likewise contends is false. (Id. Ex. 6.) The asterisk following the phrase corresponds to a disclaimer presented in small text at the bottom of the NUTRI NINJA PRO box, which states: "*Based on wattage of single serve blenders and nutrition extractors MSRP under $100." (Id.)[2]

Homeland additionally asserts that Euro-Pro is infringing its protected trade dress. As described further below, it contends that Euro-Pro has "duplicate[d] the color scheme, fonts, phraseology, and overall look and feel of the Homeland's NUTRIBULLET packaging

---

[2] The parties dispute whether any Homeland blenders other than the NUTRIBULLET CLASSIC are within the class of blenders described by the disclaimer. (See Mot. at 1; Sapire Decl. Ex. 10; Opp. at 13; Price Decl. ¶¶ 13, 15-16, Exs. N & O.)

3

trade dress in order to draw consumers to the NUTRI NINJA PRO as a result of the consumer's sense of familiarity with the NUTRIBULLET packaging trade dress." (Mot. at 4.)

Homeland seeks a preliminary injunction requiring, among other things, that Euro-Pro immediately advise retailers that no further NUTRI NINJA PRO can be sold using the current packaging, recall all NUTRI NINJA PRO products from retailers, and remove the alleged false statements and confusingly similar trade dress from the packaging of the NUTRI NINJA PRO. (See Dkt. No. 13-1.)

**II. Legal Standard**

Plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest. Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 29 (2008)).

**III. Discussion**

**A.   False Advertising**

The court considers each requirement for the issuance of a preliminary injunction as to the false advertising claim in turn.

**1.   Likelihood of Success on the Merits**

The elements of a Lanham Act § 43(a)[3] false advertising claim

---

[3] The Lanham Act § 43(a), codified at 15 U.S.C. § 1125(a), provides in pertinent part:
(1) Any person who, on or in connection with any goods or
(continued...)

4

are: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products." Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1139 (9th Cir. 1997).

To demonstrate falsity within the meaning of the Lanham Act, Homeland may show that a statement by Euro-Pro was (1) literally false, either on its face or by necessary implication, or (2) that the statement was literally true but likely to mislead or confuse consumers. Century 21 Real Estate Corp. v. Re/Max South County, 882 F.Supp. 915, 922 (C.D. Cal. 1994). In the case of a literally false claim, the plaintiff need not prove any impact on the buying public. Id. However, where a plaintiff cannot show literal falsity and instead relies on a claim of an implied falsehood, the

---

[3](...continued)
services, or any container for goods, uses in commerce any ... false or misleading representation of fact, which—
   (A) ...
   (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a) (1988).

plaintiff must prove, by extrinsic evidence, that the challenged advertisements tend to mislead or confuse consumers. Id.; Taser Int'l, Inc. v. Bestex Co., Inc., 2007 WL 2947564, at *5 (C.D. Cal. Feb. 9, 2007) aff'd, 314 F. App'x 46 (9th Cir. 2008). In this case, Homeland contends that Euro-Pro's claims are literally false. (Mot. at 6.)

"When evaluating whether an advertising claim is literally false, the claim must always be analyzed in its full context." Southland Sod., 108 F.3d at 1138 (citing, *inter alia*, Robot-Coupe Int'l Corp., 1982 WL 121559, at *2 (S.D.N.Y. June 9, 1982) ("[I]n determining facial falsity the court must view the face of the statement in its entirety, rather than examining the eyes, nose, and mouth separately and in isolation from each other.")).

A threshold issue in this case is whether the Comparison Chart presented on the NUTRI NINJA PRO packaging refers, as Homeland contends, to each of Homeland's NUTRIBULLET-branded blenders, including the NUTRIBULLET CLASSIC, NUTRIBULLET SPORT, and NUTRIBULLET PRO or only, as Euro-Pro contends, to the NUTRIBULLET CLASSIC. (See Mot. at 5; Opp. at 7.) The matter is significant because there is no dispute that three of the statements made in the Comparison Chart are false if applied to the NUTRIBULLET SPORT and NUTRIBULLET PRO, namely that the products (1) do not have a 900 Watt motor, (2) do not produce 21,000 RPMs, and (3) do not have "sip and seal" functionality. (See Opp. at 9-11.)

The court agrees with Homeland that the statements in the Comparison Chart apply, in the context in which they are presented, to each of the three "NUTRIBULLET" models. The name NUTRIBULLET is prominently displayed on the packaging of the NUTRIBULLET CLASSIC,

NUTRIBULLET SPORT, and NUTRIBULLET PRO. (See First Amended Complaint Exs. 2, 4.) Indeed, in the case of the NUTRIBULLET PRO and NUTRIBULLET SPORT, the NUTRIBULLET mark is the dominant feature relative to the modifiers "PRO" and "SPORT." (Id.) A consumer viewing the products in their retail packaging would thus naturally consider each to be a "NUTRIBULLET." However, the Chart does not differentiate between the NUTRIBULLET models, referring only to "NUTRIBULLET" with no disclaimer or other information to clarify the scope of the statements. This presentation has the effect of blurring the distinctions between the NUTRIBULLET models and creating the impression that all NUTRIBULLET products lack the features listed in the Chart.

Euro-Pro makes several arguments against this conclusion, none of which the court finds convincing. Its primary argument begins with the premise, agreed upon among the parties, that the NUTRI NINJA PRO appears alongside or nearby the NUTRIBULLET CLASSIC and the NUTRIBULLET PRO on retail store shelves. Euro-Pro argues that if a consumer encounters a representation on the NUTRI NINJA PRO box that is then contradicted by representations on the box of a NUTRIBULLET PRO located nearby, the consumer would resolve the contradiction by concluding that the statement must refer to a different NUTRIBULLET product model. (See Opp at 8.) In essence, Euro-Pro does not attempt to argue that the claims it makes in the Comparison Chart are true as to the NUTRIBULLET PRO or SPORT, but instead seeks to shift the burden to the consumer to discover the statements' falsity. The court does not believe that requiring a consumer to undertake such an investigation is consistent with the Lanham Act's purpose of protecting consumers from false

7

advertising. Nor is placing such a burden on the consumer realistic in the particular circumstances in which the products are sold. Because, as the parties agree, the products at issue are often sold on shelves with numerous other competing blender products, there is strong reason to doubt that a typical consumer would make a one-to-one comparison between the features of the parties' products and then have the realization Euro-Pro envisions. Indeed, as Homeland pointed out at oral argument, some consumers may never undertake their own comparison because, having trusted the representations on the NUTRI NINJA PRO box and concluded that it is plainly the superior product, they do not bother to seek out and review the labels on the various NUTRIBULLET models.

Second, Euro-Pro contends that Homeland concedes that the Chart refers only to the lower-end NUTRIBULLET because its trade dress infringement claim asserts infringement only with respect to the packaging of its NUTRIBULLET CLASSIC model. (See Opp. at 7 (citing Mot. at 18.)) In particular, Euro-Pro makes reference to the green background used in the NUTRIBULLET packaging, a color different from that used in the NUTRIBULLET SPORT and NUTRIBULLET PRO. (See Mot. at 18.) The court is not persuaded. The fact that the packaging of the NUTRI JINJA PRO is most similar to that of the NUTRIBULLET—-essentially because it shares the same background color--does not establish that the reference to "NUTRIBULLET" in the Chart would cause a consumer to understand the reference to apply only to that model.

Finally, Euro-Pro asserts that "the NUTRI NINJA and the NUTRIBULLET were sold for under $100," while the "NUTRIBULLET PRO and the NUTRIBULLET SPORT retailed at well over $100." (Opp. at 8.)

8

Homeland contests the accuracy of this statement in relation to the NUTRIBULLET SPORT, presenting evidence that the model has retailed in at least one instance at $119 with a special $20 discount. (See Safire Decl. ¶ 15 and Ex. 10.) Even accepting Euro-Pro's assertions as to pricing, however, the range of prices among the NUTRIBULLET models--which spans approximately $90 to $130--is not so great that Euro-Pro's reference could refer only to the lower-end NUTRIBULLET CLASSIC.[4]

The court therefore concludes that the Chart makes a claim as to each of the products that contain NUTRIBULLET in their names. As alluded to above, it follows from this conclusion that three of the statements made in the Comparison Chart are false. Specifically, it is undisputed that the NUTRIBULLET PRO (1) operates at 900 Watts, (2) produces 21,000 RPMs, and (3) features "sip & seal" (i.e. sealable drink through) lids. Euro-Pro's assertion in the Chart that the model lacks these features is literally false.

The other elements of a Lanham Act false advertising claim are met with respect to these statements. First, the claims are plainly material in that they are "likely to influence the purchasing decision" of consumers. Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc., 911 F.2d 242, 244 (9th Cir. 1990). Indeed, that the statements relate to key factors informing

---

[4] Nor does the disclaimer "*Based on wattage of single serve blenders and nutrition extractors MSRP under $100," presented in small print at the bottom of the NUTRI NINJA PRO packaging, clarify the scope as to the statements made in the Comparison Chart. The disclaimer is associated in the packaging only with the statement "#1 MOST POWERFUL!," not with the Chart. Euro-Pro does not, in any case, argue that the disclaimer limits the scope of the statements made in the Chart.

consumer decisions is evidenced by the fact that Euro-Pro itself felt the features were significant enough to consumers to highlight prominently in comparing its goods to those of its competitor. See In re Century 21-RE/MAX Real Estate Adver. Claims Litig., 882 F. Supp. 915, 923-24 (C.D. Cal. 1994) (citing In re Uranium Antitrust Litigation, 473 F.Supp. 393, 408 (N.D. Ill. 1979) for the proposition that, in evaluating materiality, courts look to whether the advertising "relates to the principal bases of competition among sellers"). Second, there is no debate that Euro-Pro caused the products bearing the false statements to enter interstate commerce. Finally, given the statements' materiality and the fact that the products are sold by the same retailers, there is little basis for doubt that Homeland is likely to be injured as a result of the false statements in the form of diverted sales or diminished goodwill.

Accordingly, Homeland has demonstrated a likelihood of success on the merits as to its false advertising claim with respect to the Euro-Pro's claims regarding wattage, RPMs, and "sip & seal" functionality.

The court does not believe that the record is sufficiently developed to reach a conclusion with respect to the veracity of the other allegedly false statements on the NUTRI NINJA PRO packaging that Homeland has cited. Accordingly, a preliminary injunction is not warranted as to those statements. The court states no opinion as to the ultimate merits of the claim with respect to those statements on a fully developed record.

**2.   Irreparable Harm**

The court finds that Homeland has shown a likelihood of irreparable harm absent the issuance of a preliminary injunction. The Ninth Circuit has held that "intangible injuries, such as damage to ... goodwill, qualify as irreparable harm." <u>Rent-A-Car, Inc., v. Canyon Television and Appliance Rental, Inc</u>., 944 F.2d 597, 603 (9th Cir. 1991) (citation omitted). In this case, by blurring the distinctions among Homeland's products through its Comparison Chart, Euro-Pro has made materially false statements regarding Homeland's NUTRIBULLET PRO and NUTRIBULLET SPORT models. These statements effectively amount to the assertion that Homeland manufactures inferior products. It is self-evident that the assertion that a company sells inferior products would have the tendency to diminish the company's goodwill among customers. Homeland has asserted such a result. (<u>See</u> Sapire Decl. ¶¶ 15-20.) Moreover, Euro-Pro's statement that the NUTRIBULLET PRO and SPORT lack a feature which Homeland's packaging specifically states that those products have carries the implication that Homeland is lying about its product's features, an assertion with obvious reputational consequences. Accordingly, the court finds that the requirement of a likelihood of irreparable harm is met. The court need not address the parties' additional arguments on this issue.

**3.   Balance of Equities**

The balance of equities favors issuance of an injunction under the terms set forth below. Homeland will clearly suffer hardship in the absence of an injunction because Euro-Pro would be able continue to disseminate false claims regarding Homeland's products.

11

At the same time, Euro-Pro will not suffer undue hardship if an injunction preventing the dissemination of such false claims is issued. As a general matter, "there is no harm to a defendant from an injunction which prevents continuing dissemination of false statements." POM Wonderful LLC, 2008 WL 4222045 at *16. Such an injunction would not prevent Euro-Pro from describing the quality of its blenders, comparing the quality of such products to that of Homeland's products, or touting its unique features, so long as it does not make claims that are false. See Visioneer, Inc. v. UMAX Technologies, Inc., 1998 WL 856080, at *3 (N.D. Cal. Dec. 7, 1998) (making similar observation with respect to comparative false advertising claim involving desktop scanners).

Euro-Pro complains that the terms of Homeland's proposed order would require it to recall all of its products and re-package them and force it out of a crowded market just prior to the start of the holiday season, thus harming not only Euro-Pro but consumers as well. (Opp. at 24.) However, the injunction issued herein will not require an immediate recall of products from retail shelves and will instead allow Euro-Pro a reasonable period of four months to liquidate its inventory and phase-in new packaging that eliminates the false statements.

**4.  Public Interest**

"There is a strong public interest in preventing false advertising of products in the marketplace." POM Wonderful LLC v. Purely Juice, Inc., 2008 WL 4222045 (C.D. Cal. July 17, 2008) aff'd, 362 F. App'x 577 (9th Cir. 2009) (citing Kennedy Industries, Inc. v. Aparo, 416 F.Supp.2d 311, 317 (E.D.Pa. 2005)). See also Church & Dwight Co., Inc. v. S.C. Johnson & Son Inc., 873 F.Supp.

12

893, 912 (D.N.J. 1994) (granting injunction preventing defendant from deceptive advertising and stating that "the public has a right not to be deceived or confused"). In contending that the public interest is not served by the issuance of a preliminary injunction in this case, Euro-Pro's only argument is that Homeland has not offered proof of consumer confusion. (See Opp. at 24.) However, as discussed above, such proof is not required in the case of statements that are literally false such as those at issue here. See Taser Int'l, Inc., 2007 WL 2947564 at *5. Accordingly, the court finds that the issuance of a preliminary injunction will serve the public interest.

In sum, Homeland has demonstrated that a preliminary injunction barring Homeland from continuing to make the false statements described above is justified. The terms of the preliminary injunction are set forth below.

**B.   Trade Dress Infringement**

The court next considers Homeland's request for a preliminary injunction with respect to its trade dress infringement claim, concluding that no such relief is warranted. The trade dress infringement claim applies only to the NUTRIBULLET CLASSIC.

**1.   Likelihood of Success on the Merits**

Trade dress, or the "total image of a product," is protectable under Section 43(a) of the Lanham Act. Int'l Jensen, Inc. v. Metrosound U.S.A., Inc., 4 F.3d 819, 822 (9th Cir. 1993). To succeed on a trade dress infringement claim, which is analytically similar to an unregistered trademark claim, a plaintiff must show

that a trade dress is (1) nonfunctional, (2) inherently distinctive or has acquired secondary meaning, and (3) that a defendant's use of a similar mark or trade dress is likely to confuse consumers. Id. at 823. Homeland's motion for a preliminary injunction is unsuccessful because it has not shown a likelihood of success as to either prong of the second element of its claim.

Homeland's trade dress for the NUTRIBULLET is not inherently distinctive. To be "inherently distinctive," a trade dress must identify a particular source of a product. Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992). "The attribution of inherent distinctiveness to certain categories of . . . product packaging derives from the fact that the very purpose of . . . encasing [a product] in a distinctive packaging, is most often to identify the source of the product. Where it is not reasonable to assume consumer predisposition to take . . . packaging as indication of source, inherent distinctiveness will not be found." Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 212 (2002). In other words, inherently distinctive trade dress is that which has a "design, shape or combination of elements [ ] so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indicator of origin." 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 8:13 at 8-77 (4th ed. 2014).

Here, Homeland describes its trade dress as follows: "Homeland has developed a unique color scheme, fonts, phraseology, and overall look and feel in its packaging trade dress as an indicator of source." (Mot at 16.) It contends that Euro-Pro is infringing its trade dress by use of "(a) phraseology ("Nutri," "Pro,"

14

"Extractor," "Watts"), (b) layout of texts and pictorial elements, (c) selected orange lettering, and (d) most conspicuously, its depiction of a blender with an inverse container against a predominantly <u>green</u> background, showing a cornucopia of fruits and vegetables in similar position[s]." (Mot. at 18) (emphasis in original). Homeland argues that "[s]ince Homeland's unique color scheme, fonts, and phraseology are arbitrary, its packaging trade dress is inherently distinctive and supports a conclusion that Euro-Pro infringed Homeland's trade dress." (<u>Id.</u> at 16.)

The court is not persuaded. Leaving aside the vague description of several elements of its asserted trade dress, Homeland's trade dress claim fails because most of the elements it contends comprise its trade dress are not, in fact, arbitrary or unexpected given the nature of the product. There is nothing arbitrary about the phrases "nutri" (connoting the product's capacity for making nutritious beverages and snacks), "watts" (describing the product's power, as blenders are often marketed for their power), "extractor" (describing the product's capacity to extract nutrition from fruits and vegetables), and "pro" (implying increased functionality more suitable for use by professionals in commercial setting). Nor is the presentation of an arrangement of fruits and vegetables behind the blender arbitrary given that the product's primary function is to create drinks by blending fruits and vegetables. The presentation of an "inverse container" merely refers to an image of the product itself, which, like other products of its sort, operates with the vessel upside down. Finally, the green background, the feature most distinguishing the NUTRIBULLET CLASSIC's packaging from competing products cited by

15

Homeland other than the NUTRI NINJA PRO, does not appear to be especially arbitrary given the Homeland's emphasis in its marketing on the nutritional benefits of the product. (See Sapire Decl. Ex 2 (presenting packaging of selected competitor blenders).) In sum, Homeland has not offered evidence that its packaging is "so uniquely designed that a buyer would rely on it to differentiate the source of the product." Seirus Innovative Accessories, Inc. v. Gordini U.S.A. Inc., 849 F. Supp. 2d 963, 984 (S.D. Cal. 2012).

Nor has Homeland presented convincing evidence that its packaging has acquired secondary meaning. Secondary meaning is the "mental association by a substantial segment of consumers and potential customers between the alleged trade dress and a single source of the product." Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1354 (9th Cir. 1985) (en banc) (internal quotations omitted). Secondary meaning can be established through direct evidence such as consumer surveys and testimony or circumstantially through "exclusivity, manner, and length of use of a mark; amount and manner of advertising; amount of sales and number of customers; established place in the market; and proof of intentional copying by the defendant." Filipino Yellow Pages, Inc. v. Asian Journal Publ'n, Inc., 198 F.3d 1143, 1151 (9th Cir. 1999).

Homeland's sole basis for its contention that its trade dress has acquired secondary meaning is that it has spent "several hundred million dollars on advertising and promoting the NUTRIBULLET line of kitchen appliances and associated trade dress to single itself [out] as the producer of the NUTRIBULLET line." (Mot. at 16 (citing Sapire Decl. ¶¶ 3, 6).) However, "the true test of secondary meaning is the effectiveness of the advertising

16

effort." <u>Art Attacks Ink, LLC v. MGA Entm't. Inc</u>., 581 F.3d 1138, 1146 (9th Cir. 2009) (internal quotations omitted). The crucial issue is not "the fact of product promotion, but the effectiveness of such promotion in creating a secondary meaning for the trade dress at issue." <u>DCNL Inc. v. Almar Sales Co.</u>, 1997 WL 913941 (N.D. Cal. Dec. 22, 1997) <u>aff'd sub nom.</u> <u>DCNL, Inc. v. Almar Sales Co., Inc.</u>, 178 F.3d 1308 (Fed. Cir. 1998).

In this case, Homeland has not pointed to any evidence of the effectiveness of its advertising in creating a secondary meaning for its trade dress other than providing the dollar figure of its overall advertising budget, which has little meaning without context. Indeed, as Euro-Pro points out, Homeland has not presented evidence that its advertising efforts, which it states included television commercials and advertising in magazines, were directed to or focused on the NUTRIBULLET's packaging trade dress, as opposed to promoting the NUTRIBULLET products themselves. (Opp. at 18.) Accordingly, Homeland's argument that the trade dress has acquired secondary meaning is unsuccessful.

Because the court finds that Homeland has not shown a likelihood of satisfying either prong of the second element of its trade dress infringement claim, its request for a preliminary injunction as to that claim must be denied.

**IV. Preliminary Injunction**

In light of the foregoing, the court issues the following preliminary injunction:

DEFENDANT EURO-PRO OPERATING LLC, and all persons acting under its direction, control, permission, or authority of them, and all

persons acting in concert therewith, are ordered to take the following actions: Within 120 days of the issuance of this Order, remove, or cause the removal of, the following statements from the packaging of all NUTRI NINJA PRO products on sale to consumers and from any other Euro-Pro advertisements or commercials:

    (1) that "NUTRIBULLET" products do not operate at 900 watts;

    (2) that "NUTRIBULLET" products do not produce 21,000 RPMs; and

    (3) that "NUTRIBULLET" products do not have "sip & seal" (or drink through) lids.

In light of the ample opportunity afforded Euro-Pro to make modifications to the packaging and advertising that is the subject of this injunction, only a minimal undertaking is required. Therefore, this preliminary injunction is effective immediately upon the plaintiffs' filing with the court proof of an undertaking in the sum of $50,000.

IT IS SO ORDERED.

Dated: August 22, 2014

                                      DEAN D. PREGERSON

                                      United States District Judge